

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

February 16, 2018

**BY ECF AND HAND DELIVERY**
Hon. Richard J. Sullivan
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>United States</u> v. <u>Cyrus Little</u>, 17 Cr. 183 (RJS)

Dear Judge Sullivan:

      The Government respectfully submits this letter in advance of defendant Cyrus Little's sentencing in this matter, which is currently scheduled for February 23, 2018 at 10:30 a.m. On October 11, 2017, the defendant pled guilty to conspiring to distribute and possess with the intent to distribute marijuana in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(D), and possessing a firearm in furtherance of that drug-trafficking offense, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

      As calculated by the United States Probation Department ("Probation"), the Guidelines sentencing range is 78 to 84 months' imprisonment. For the reasons set forth below, the Government respectfully submits that a Guidelines sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

<h2 align="center"><u>Background</u></h2>

      The charges in this case stem from the defendant's possession of a firearm and marijuana on February 18, 2017, subsequent to a shooting near Moshulu Parkway and Jerome Avenue, Bronx, New York (the "Shooting"). As described in more detail below, immediately following the Shooting, the defendant was arrested in possession of, among other things, a loaded .22 caliber Rohm revolver (the "Firearm") and 33 bags of marijuana.

### A.     The February 18, 2017 Shooting and the Defendant's Arrest

On February 18, 2017, multiple individuals made at least three 911 calls between approximately 10:50 p.m. and 11:00 p.m. ("Call-1", "Call-2", and "Call-3") reporting, in substance and in part, that there was a fight between two groups of individuals in the vicinity of East 208th Street and Jerome Avenue; that some of those individuals had weapons, including bats; and that, at some point, an individual brandished a gun and fired it at least once.[1]  (*See* Exhibit A, CL_110 ("Call-1"), CL_111 ("Call-2"), and CL_112 ("Call-3").)  Following the 911 calls, several NYPD Officers responded to the vicinity of where the fight and Shooting occurred.  (Presentence Report dated January 3, 2017 ("PSR") ¶ 9.)

---

[1] In Call-1, the following exchange occurred, in substance and in part:

| | |
|---|---|
| Operator: | 911, what's the emergency? |
| Caller-1: | Ummm, 208th and Moshulu, there's ah fight in the street, big fight [. . . .] |
| Operator: | You said 208th Street? |
| Caller-1: | There is a, someone has a gun, let's go guys, the fuck! |
| Operator: | Hello, caller?  Hello caller |
| Caller-1: | Jerome Avenue on 208th |
| Operator: | Okay you screaming at me is not gonna get you anywhere.  I need to know an address |
| Caller-1: | I'm sorry, 208th and Jerome Avenue.  They shot in the street. |

In Call-2, the following exchange occurred, in substance and in part:

| | |
|---|---|
| Operator: | 911, what's the emergency? |
| Caller-2: | Hi, how are you?  Ummm, there is like a big brawl between 208th Street. Ummm, up the block from Jerome Avenue there is a few kids that have bats, they have chairs, they're like beating each other up |
| Operator: | 208th and where? |
| Caller-2: | 208th, this is 208th and what?  208th and Jerome |
| [*Sound of gunshot*] | |
| Operator: | And Jerome? |
| Caller-2: | And I think, that's [U/I] a gunshot?  Oh wow, okay, so now I can't go to the gym |
| Operator: | Okay so the gunshot went? |
| Caller-2: | Yes ma'am |
| Operator: | How many shots did you hear? |
| Caller-2: | Two |
| Operator: | And did you see anyone or no? |

Honorable Richard J. Sullivan
February 16, 2018
Page 3 of 8

One of the NYPD Officers who responded to the scene ("Officer-1") observed a group of individuals walking westbound on West Gun Hill Road. Officer-1 drove past the group, did a U-turn in his car, and then stopped. Around this time, Officer-1 observed all of the individuals in the group stop walking except for one, later identified as the defendant. Instead of stopping, the defendant began running down West Gun Hill Road and then turned left onto Gates Place. Officer-1 and another officer pursued on foot, and Officer-1 observed something clutched in one of the defendant's hands. (PSR ¶ 10.)

Around the time that Officer-1 was pursuing the defendant, another officer ("Officer-2") who was patrolling in a separate vehicle, observed the defendant running down Gates

| | | |
|---|---|---|
| Caller-2: | Yea lots of kids running. There's more than 15. | |
| [. . . .] | | |
| Operator: | Okay. Now you said children, you said people are scattered? | |
| Caller-2: | Yea, they're like, the, them, they're, they're all over the place. After the gunshots they all ran. They're still a few of them going back and forth | |
| Operator: | Going back and forth towards where? | |
| Caller-2: | Ummm, I'm just trying to stay in the pizza shop cause I don't want them to know that I'm on the phone. Ummm, okay, some ah, most of them are are on one half of Jerome. It looks like they're is two different kind of groups. Ummm, one group is towards Jerome petering with the other group up the block. | |

In Call-3, the following exchange occurred, in substance and in part:

| | | |
|---|---|---|
| Operator: | 911, where's the emergency? | |
| Caller-3: | Hi, yes, I saw a whole group of kids, teenagers with bats and ummm, other weapons | |
| Operator: | What weapons did you see? | |
| Caller-3: | Ummm, they have like, a lot of stuff in their hands, they're running back and back. They're on 208th | |
| Operator: | What stuff, [U/I], what do they have in their hands | |
| Caller-3: | Ummm, I can't really see, am not trynna, like [I/A]. And a gun, and a gun, and a gun | |
| Operator: | Alright, where where you located? Where they located? | |
| Caller-3: | Jerome. They have a gun. They just shot someone | |
| Operator | Where they, where you located? | |
| Caller-3: | We're at 208th and ummm, 55 East 208th Street | |
| [. . . .] | | |
| Operator | How many shots did you hear? | |
| Caller-3: | 1 shot. 1 shot. | |

Honorable Richard J. Sullivan
February 16, 2018
Page 4 of 8

Place with a firearm in his right hand.  Officer-1 and Officer-2 then both observed the defendant turn into the entryway of an apartment building at 3440 Gates Place (the "Apartment Building"). The defendant opened the front door to the Apartment Building and entered the vestibule to the building's lobby.  Almost immediately thereafter, the defendant exited the Apartment Building with his hands raised.  Notably, while the defendant was in the vestibule, Officer-1 observed the defendant appear to throw an object, and another officer saw that the defendant had a gun.   (PSR ¶ 11.)

The defendant was subsequently placed under arrest, and the Firearm was recovered on the ground of the vestibule of the Apartment Building.  The Firearm contained two rounds of live ammunition and one spent shell casing. (PSR ¶ 11.)  Ballistics analysis subsequently confirmed that the spent shell casing had been discharged from the Firearm.  At the police station, officers also recovered a sandwich-sized plastic bag inside of the defendant's jacket.  Inside that plastic bag, which the defendant stated belonged to him, were 33 bags of marijuana.  (PSR ¶ 12.) Also at the police station, the defendant gave a videotaped, post-arrest interview.  During that interview, the defendant stated, in substance and in part, the following:

- Prior to his arrest, the defendant observed a group of people who were members of a gang known as "G-Side."  One of the G-Side members approached the defendant, pointed the Firearm at the defendant, fired one shot, and then dropped the Firearm. The defendant then grabbed the Firearm while members of G-Side ran away;

- The defendant possessed the Firearm and tossed the Firearm away after the officers pursued him;

- The defendant had previously been robbed by members of G-Side.  The defendant associates with members of MMOB, but he is not a member;

- The defendant was in possession of marijuana for personal use.

(PSR ¶ 13.)

The defendant's statements to law enforcement that he was not involved in drug dealing, that the Firearm did not belong to him, that the Firearm had been used to shoot at him, and that he was not a member of MMOB were false.

In fact, based on testimony from a cooperating witness and social media postings of the defendant and rap videos made by him, the defendant was, in fact, (i) a member of MMOB, a street crew that operated in and around Moshulu Parkway and Jerome Avenue in the Bronx, New York; (ii) a marijuana dealer in and around Moshulu Parkway and Jerome Avenue; and (iii) the defendant possessed the Firearm prior to the date of his arrest, and, a few days earlier, he video-recorded himself on his phone showing off the Firearm in a car, on the subway, and in a bathroom.

Honorable Richard J. Sullivan
February 16, 2018
Page 5 of 8

(PSR ¶14; *see also* Exhibit A, CL_0050, CL_0051, CL_0053 (videos of the defendant with the Firearm and draft transcripts of those videos); and CL_0166 (a video of the defendant throwing trash at a disabled individual to get him to move away from the corner where the defendant was selling drugs).  During one video, the defendant explained, referring to the Firearm, that because (i) other people were "snitching" he was "always protecting," and (ii) that "gotta protect myself cuz' I am in the streets."  (*See* Exhibit A, CL_0053; Transcript CL_0053.)

### B.      The Defendant's Attempted Guilty Plea – Obstruction of Justice

On October 3, 2017, the defendant attempted to plead guilty pursuant to a plea agreement to possessing the Firearm in furtherance of his drug-trafficking crime, a lesser-included offense of Count Two of the Indictment.  During his plea allocution, the defendant initially stated: "I picked up a gun that wasn't mine and walked off with it, and I had marijuana on me to smoke. I should have left my marijuana upstairs. . . . It was a brawl going on and [the Firearm] had dropped to the floor, and I picked it up." (Plea Tr. at 42:11-13, 16-17; *see* PSR ¶ 16.)  In response to direct questioning by the Court, the defendant confirmed that he possessed marijuana only for his personal use.  (*Id.* at 43:15-24; *see* PSR ¶ 16.)

After the Court made clear that the defendant's allocution was insufficient to plead guilty, the defendant reversed course and stated:  "I possessed multiple bags of marijuana that I intended to sell, and I picked up a gun that I had in my possession."  (Plea Tr. at 44:13-15; *see* PSR ¶ 17.)  The Court then asked the defendant whether he was selling marijuana at the time he picked up the gun, to which the defendant stated, "[y]es, I was selling marijuana." (*Id.* at 44:16-18; *see* PSR ¶ 17.)  The Court then asked why the defendant stated earlier that the marijuana was for his personal use, to which the defendant responded: "Yes, because I smoke a lot of marijuana. But I do sell to my friends to get my money back."  (*Id.* at 44:19-23.)  The Court declined to accept the defendant's guilty plea based on his contradictory allocution.  (*See* PSR ¶ 17.)

As stipulated in the plea agreement, and as confirmed on the  record during his second successful plea allocution, these statements to the Court on October 3, 2017, given under penalty of perjury, were not true and accurate.  (*See* PSR ¶ 18.)

### C.      The Guidelines Calculations and Defendant's Criminal History

On October 11, 2017, the defendant pleaded guilty to Counts One and the lesser-included offense of Count Two, possession of a firearm in furtherance of Count One, pursuant to a plea agreement.  (*See*  PSR ¶ 6.[2])  The plea agreement stipulated an offense level of 8 and a Criminal History Category of V, resulting in a Stipulated Guidelines Range of 75 to 81 months' imprisonment, with a mandatory minimum of sixty months' imprisonment.  (*See* PSR ¶ 6.)

---

[2] The PSR mistakenly identifies the date of the written plea agreement as June 7, 2017.  (PSR ¶ 6.)  The plea agreement actually was dated October 5, 2017.

Honorable Richard J. Sullivan
February 16, 2018
Page 6 of 8

In the PSR, the Probation Department calculated that the defendant has a total offense level of 8, and a Criminal History Category of VI, the most serious criminal history category.[3]  (*See* PSR ¶¶ 21-62.)  Indeed, the defendant has amassed a substantial criminal history reflecting a pattern of misconduct and disregard for the law.  The instant offense represents the defendant's *29th conviction*, although it is his first felony offense.  Several of these offenses involve either a weapon or the threat or actual use of force, including a 2007 conviction arising from possession of a loaded 9mm handgun and a "sawed off shotgun," (PSR ¶ 34), a 2007 conviction arising from displaying three to four rounds of ammunition to his mother and threatening that the ammunition was for her (PSR ¶ 37), a 2008 conviction for assault (PSR ¶ 38), and a 2009 conviction for public lewdness for masturbating in front of the victim inside her office and then attempting to grab the victim while continuing to masturbate (PSR ¶ 40).  The defendant's remaining offenses largely consist of convictions for sale of marijuana as well as possession of marijuana in distribution quantities.  (PSR ¶¶ 33-60.)

## Discussion

A particularized consideration of the factors set forth in Title 18, United States Code, Section 3553(a) demonstrates that a sentence within the Guidelines range is appropriate in this case.  Two of the most important factors are the nature and seriousness of the offense and the need for both specific and general deterrence.

First, the defendant's offense is extremely serious.  *See* 18. U.S.C. §§ 3553(a)(1), (2)(A).  The defendant was a participant in a brawl and subsequent shooting between his gang (MMOB) and a rival gang on a public street.  Violence like this terrorizes the community, as firmly evidenced by the numerous 911 callers regarding this Shooting.  Fortunately, no one was injured, but that result was no thanks to the defendant, who fled the scene with the Firearm and left the Firearm unattended in an apartment building.  Beyond being involved in violence and the possession of firearms, the defendant is also a drug dealer who harasses others who he views as infringing on his turf.  Indeed, in one video, the defendant is throwing trash at a disabled individual to force that individual to move away from the corner where the defendant was selling drugs.  (*See* Ex. A., CL_0166.)  This conduct is disgraceful and a detriment to the community.

Second, the need for the sentence imposed to provide for specific and general deterrence weighs in favor of a Guidelines sentence.  *See* 18 U.S.C. § 3553(a)(2)(B).  The defendant has almost thirty convictions, which is a staggering number.  He has shown a consistent disregard for the consequences of his actions.  A significant sentence is necessary to dissuade the

---

[3] The difference in criminal history points between the plea agreement and the PSR results from a conviction stemming from a September 13, 2007 arrest, which resulted in two criminal history points, that inadvertently was omitted from the plea agreement.  (PSR ¶ 111.)

Honorable Richard J. Sullivan
February 16, 2018
Page 7 of 8

defendant from once again returning to crime, as he did after his prior firearms arrest. Similarly, a Guidelines sentence will protect the public from future crimes of the defendant, a goal prior convictions failed to achieve. § 3553(a)(2)(C). A Guidelines sentence would also help deter others from making the same choices as the defendant and send the message that drug dealing and firearms possession will carry serious consequences.

In his sentencing submission, the defendant requests a substantial variance of the mandatory minimum, citing his history and characteristics—including his difficult upbringing and mental history—as mitigating factors. The defendant also submitted a forensic evaluation by Dr. Barday describing the defendant's history and characteristics. These are obviously relevant considerations for the Court in applying Section 3553(a) in this case. However, although the defendant appears to have significant mental and psychiatric challenges, these circumstances are not unlike those faced by many in society who do not engage in gang activity, drug dealing, firearms possession, and violence. Indeed, despite these challenges, he has reported that he performed as a musician and professional entertainer, earning more than $2,000 per show, and would tour locally, as well as to different regions of the United States. (PSR ¶ 101.)

Lastly, the Government notes that the defendant was allowed to enter an agreement to plead guilty to a lesser-included offense of Count Two, therefore, avoiding a mandatory minimum of 10 years' imprisonment. The plea agreement in this case thus reflects a measured approach to the offense, sentencing, and the Guidelines calculation here.

In sum, in light of the serious nature of the criminal activity that the defendant elected to participate in, a substantial sentence is necessary to serve the ends of sentencing—including promoting respect for the law, providing just punishment for this particular defendant, and serving the needs of both specific and general deterrence.

Honorable Richard J. Sullivan
February 16, 2018
Page 8 of 8

## **<u>Conclusion</u>**

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence, as such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:            /s/
                 _____
Eli J. Mark / Matthew Laroche
Assistant United States Attorneys
(212) 637-2431 / -2420


cc:      A. James Bell, Esq. (via ECF and mail)
        *Counsel for Cyrus Little*